IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELMER DANIELS,

    *Plaintiff,*

    v.

CITY OF WILMINGTON; PHILIP A.
SAGGIONE, III; and JOHN DOES 1–10,

    *Defendants.*

No. 20-cv-1692

Theopalis K. Gregory, Emeka Igwe, THE IGWE FIRM, Wilmington, Delaware.

*Counsel for Plaintiff*

Daniel A. Griffith, WHITEFORD, TAYLOR & PRESTON LLC, Wilmington, Delaware.

*Counsel for Defendants*

**MEMORANDUM OPINION**

March 29, 2024

BIBAS, *Circuit Judge*, sitting by designation.

    Courts cannot right all wrongs. Elmer Daniels spent nearly 40 years in prison for a crime he may not have committed. He now seeks to recover damages from the City of Wilmington and its detectives for improper training, due-process violations, and intentional infliction of emotional distress. But because he has shown no genuine dispute of material fact, I grant summary judgment for Defendants.

## I. DANIELS SERVES NEARLY FORTY YEARS IN PRISON FOR RAPE

### A. Police investigate a rape and arrest Daniels

One afternoon in January 1980, two teenagers left a house party to walk to a gas station. D.I. 52-2, at 4. There, the girl called her mom while the boy used the restroom. D.I. 57-1, at 5:9–6:10. The pair then headed over to a nearby railroad bridge, where they started kissing. *Id.* at 6:16–7:17. Eventually, the kissing turned to sex. *Id.* at 8:2–7. But they were abruptly interrupted when a man attacked them. *Id.* at 8:12–23. He threw the boy to the ground, grabbed the girl by the throat, and raped her. *Id.*; D.I. 52-2, at 4. Though the boy ran for help, the man was gone when he returned. D.I. 57-1, at 9:10–15, 11:7–8.

Wilmington Police Detective Charles Esham started investigating. D.I. 52-1, at 18:8–10. Several other detectives assisted him in the investigation, including Detective Philip Saggione. *Id.* at 18:1–23. When the detectives interviewed the girl that night, she described her attacker as a black man roughly 5'8" to 6' tall, weighing about 165 pounds, "with a short Afro haircut and short sideburns." D.I. 52-2, at 4–5. She also said that he had been "wearing a green army coat and tan dress pants." *Id.* But after viewing a 200-photo array, she could not identify him. *Id.* at 5, 17.

Police then talked to the boy. D.I. 57-1, at 39:13–22. He gave the first of what would be four conflicting statements. *Id.* at 19:22–20:1. He said that he and the girl had been sitting by the railroad tracks when a man appeared. D.I. 52-2, at 4. Before the man attacked them, he identified himself as "Jake Johnson," a security guard for the railroad. *Id.*; D.I. 57-1, at 12:23–13:7. Like the girl, the boy said the man was wearing a green coat and tan pants. D.I. 52-2, at 17.

2

The next day, detectives picked up the boy for another interview. D.I. 57-1, at 15:19–16:4, 45:8–15. This time, he said that he had lied the day before. *Id.* at 47:11–13. He now claimed that the attack had happened while he and the girl were having sex. *Id.* at 49:8–17.

During the interview, Detective Saggione came into the room and told the boy that the police had gotten a phone call. *Id.* at 17:4–6. The caller said that, a few hours before the attack, the boy had been seen smoking a joint with someone by the railroad tracks. *Id.* at 17:4–10. After the boy admitted that was true, the police threatened to charge him with third-degree rape. *Id.* at 17:8–10, 48:10–12. In response, the boy admitted for the first time that he knew the attacker, identifying him as "Elmer." *Id.* at 48:16–19. He said that he knew Elmer because they had been in the same eighth-grade class several years before. D.I. 52-2, at 5.

Early the next morning, the boy changed his story yet again. He denied having sex with the girl. D.I. 57-1, at 51:4–8. And though he maintained that Elmer was the culprit, the boy also denied seeing him earlier in the day. *See id.* at 53:2–5. Then, after police arrested him for hindering prosecution, he made one last change: he retracted those denials but still identified Elmer as the attacker. *Id.* at 52:18–53:5.

Armed with the name "Elmer," the police soon found a suspect—Elmer Daniels. Detective Saggione went to the boy's former middle school, where a teacher remembered Daniels and the boy being in his class together. D.I. 52-1, at 90:12–22. Detectives Esham and Saggione then got a search warrant for Daniels's home. *Id.* at 64:14–17, 66:8–24. There, police found clothes matching the description given by the

3

teenagers. D.I. 52-2, at 17. And when police showed the girl a new array of 50 photos, including one of Daniels, she picked him out and said she was "positive" that he had attacked her. *Id.* at 6, 17. So Daniels was arrested and charged with first-degree rape. *See id.* at 17.

### B. Daniels is convicted and sentenced to life in prison

At trial, the prosecution put on evidence tying Daniels to the attack. Both teenagers identified him as the attacker. *Id.* at 10; D.I. 57-1, at 21:9–12. The prosecution bolstered the boy's identification by calling witnesses, including the teacher, who testified that the boy and Daniels had been classmates. D.I. 52-1, at 119:16–21; D.I. 57-2, at 4:1–14. And it introduced into evidence the clothes found at Daniels's home. *See* D.I. 52-2, at 17.

The prosecution also relied on expert testimony by FBI Special Agent Michael Malone. *Id.* at 6. He claimed that a hair recovered from the girl's clothes matched Daniels's hair and a hair recovered from Daniels's clothes matched the girl's hair. *Id.* at 6–7. So, between the physical evidence and scientific analysis, the prosecution argued that it had proven Daniels's guilt beyond a reasonable doubt. *Id.* at 8–9.

The jury agreed. It convicted Daniels of first-degree rape and sentenced him to life in prison. *Id.* at 17. He would spend most of the next thirty-nine years there. *Id.* at 3.

### C. The Delaware Attorney General seeks to free Daniels

In 2018, several events called Daniels's conviction into question. Early in the year, the FBI sent a letter to the Delaware Attorney General concluding that Special Agent Malone's hair analysis had "exceeded the limits of science." *Id.* at 44–47. So Daniels asked the Delaware Department of Justice's Actual Innocence Program to review his

4

conviction. *Id.* at 10. But after a former Delaware Supreme Court Justice reviewed the evidence, he concluded that it did not establish Daniels's innocence. *Id.*

Still, the Delaware Department of Justice kept investigating. Later in 2018, it moved to dismiss the indictment against Daniels based on newly uncovered school transcripts and the faulty FBI hair analysis. *Id.* at 2–3. Those transcripts suggested that the boy and Daniels had not been classmates. *Id.* at 16–17. Though the State could not "declare Mr. Daniels innocent," it argued that his case should be dismissed "based on … time served and the interests of justice." *Id.* at 3, 17–18. And after a court agreed, Daniels was freed. *See* D.I. 52-1, at 25:14–18.

### D. After his release from prison, Daniels sues

Two years after getting out, Daniels sued the United States, the City of Wilmington, Special Agent Malone, Detective Saggione, and John Does 1–10 for his wrongful imprisonment. First Am. Compl. 1. (The lead investigator, Detective Esham, died before Daniels brought the suit. D.I. 52-1, at 126:18–20.) After a motion to dismiss, Daniels dropped his claims against the United States and Malone. D.I. 26, 32, 40. The City of Wilmington, Detective Saggione, and John Does 1–10 remained as defendants.

At the close of discovery, Defendants filed this motion for summary judgment. D.I. 51. And because they argued for the first time on reply that Daniels's § 1983 claims against Detective Saggione fail as a matter of law, I let Daniels file a sur-reply on that issue. *See* D.I. 59; Fed. R. Civ. P. 56(f).

## II. DANIELS RAISES NO GENUINE DISPUTES OF MATERIAL FACT

Daniels has five claims left. Four are under 42 U.S.C. § 1983: (1) the City of Wilmington is liable under *Monell* for failing to train Detective Saggione, Detective

5

Esham, and John Does 1–10 on proper police procedures; (2) Detective Saggione has supervisory liability for his role in the Daniels investigation; (3) Detective Saggione and John Does 1–10 violated due process by making up evidence; and (4) Detective Saggione and John Does 1–10 violated due process by failing to disclose exculpatory evidence. Finally, he claims that, under Delaware state law, (5) Detective Saggione and John Does 1–10 intentionally caused him emotional distress. I exercise federal-question jurisdiction over Daniels's § 1983 claims and supplemental jurisdiction over his state-law claim. 28 U.S.C. §§ 1331, 1367(a). I address each in turn.

At summary judgment, the moving party must first show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Tundo v. County of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019) (internal quotation marks and brackets omitted). Yet the nonmoving party cannot "rest upon the mere allegations or denials of his pleadings." *Jutrowski v. Riverdale Township*, 904 F.3d 280, 288 (3d Cir. 2018) (internal quotation marks omitted). Rather, he "must set forth specific facts showing that there is a genuine issue for trial." *Id.*

**A. Daniels's prosecution ended in his favor**

Defendants first argue that Daniels's § 1983 claims fail under *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* held that when a § 1983 claim casts doubt on a conviction's validity, the plaintiff must show that the prior criminal proceeding "terminat[ed] … in favor of the accused." *Id.* at 484. The Third Circuit has explained that making this showing requires "a prior criminal case" to be "disposed of in a way that indicates the

6

innocence of the accused." *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009). So, Defendants argue, because the Delaware Attorney General was "unable to declare Mr. Daniels innocent" when it moved to dismiss the charges, Daniels has not met this requirement. D.I. 52-2, at 3.

But the Supreme Court recently abrogated *Kossler*, making clear that a plaintiff need not "show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). The Third Circuit then explained that *Thompson* "streamlined our favorable-termination analysis," meaning we now look only to whether "the prosecution terminates without a conviction." *Coello v. DiLeo*, 43 F.4th 346, 354–55 (3d Cir. 2022) (internal quotation marks and brackets omitted). Here, it did. The charges against Daniels were dismissed. So *Heck*'s favorable-termination requirement does not bar his § 1983 claims.

### B. Daniels's *Monell* claim fails

Defendants next argue that Daniels has presented no evidence from which a reasonable jury could find that the City of Wilmington failed to train, supervise, or discipline its police officers. Thus, they say, Daniels's § 1983 claim against the city fails. I agree.

Under § 1983, plaintiffs may sue a municipality that, under color of state law, deprives them of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But a municipality cannot be held liable under respondeat superior. *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, a plaintiff must show that the alleged constitutional violation stems from either "an official … policy[]" or a custom so "well-settled as to virtually constitute law." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (internal quotation marks omitted).

One policy or custom can be "fail[ing] to act affirmatively at all," such as by not adequately training or supervising employees. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks omitted). In that situation, a plaintiff must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers [were] … *deliberately indifferent* to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (emphasis added). This requires more than "even heightened negligence"; it requires a "stringent standard of fault." *Brown*, 520 U.S. at 407, 410.

In response, Daniels points to two exchanges from the deposition of Detective Saggione. Resp. Br. 14–15. There, Detective Saggione stated that though he "had training as [a] Wilmington Police Officer in investigations," he did not recall what that training was. D.I. 52-1, at 11:21–12:24, 36:9–16.

But these statements fall far short of the stringent standard of fault. Even taking them in the light most favorable to Daniels, they show that Detective Saggione *did* get some training. And Daniels points to no specific facts showing that training was inadequate. So no reasonable jury could find that the City of Wilmington was deliberately indifferent to the need to train and supervise its officers.

**C. Daniels's other § 1983 claims fail too**

Defendants also argue that Daniels points to no genuine disputes of material fact about any of his other § 1983 claims. Again, I agree.

Take his claim for supervisory liability. As with a municipality, a plaintiff claiming supervisory liability must show that the supervisor was "the moving force behind the constitutional violation of a subordinate" and so "exhibited deliberate

8

indifference." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (internal quotation marks and brackets omitted).

But Daniels identifies no one whom Detective Saggione supervised. The detective repeatedly emphasized in his deposition that he played a minor role in the investigation and worked under Detective Esham. D.I. 52-1, at 18:8–19:2, 67:1–68:7, 124:7–19, 125:10–13, 128:20–22. True, Detective Saggione was present for some interviews, talked to the middle-school teacher, and signed off on the search-warrant application with Detective Esham. *Id.* at 124:20–125:3. Yet that shows only that Detective Saggione took part in the investigation, not that he led it. Plus, Daniels did not address this claim in his sur-reply. *See* Sur-Reply 2–5. So his supervisory-liability claim fails.

Next, Daniels claims that Detective Saggione and John Does 1–10 made up evidence against him by "forc[ing] [the boy] to identify Daniels as the rapist." *Id.* at 3. But Daniels points to no made-up evidence. Admittedly, the boy changed his story multiple times and did not mention the name "Elmer" until after the police threatened to charge him with third-degree rape. D.I. 57-1, at 48:10–19. Yet he also accurately described clothes in his first interview (before the alleged coercion) that were later found in Daniels's home. D.I. 52-2, at 17. And Daniels points to no facts showing that Detective Saggione or any other officer ever made the boy give them Elmer's name in particular. So, like the *Monell* claim, this claim cannot survive summary judgment.

Finally, Daniels claims that Detective Saggione and John Does 1–10 withheld evidence, leading to his conviction. Not so. Daniels cannot identify any evidence that they allegedly withheld. Instead, he argues that Detective Saggione should have

9

disclosed that the boy and Daniels did not attend school together. Sur-Reply 6. Yet nothing suggests that Defendants *knew* this fact in 1980. Because they could not have withheld evidence that they did not have, there is no genuine dispute of material fact for a jury to decide.

**D. Delaware's Tort Claims Act bars Daniels's state-law claim**

Finally, Defendants argue that Detective Saggione is immune from suit under Delaware's County and Municipal Tort Claims Act. *See* Del. Code Ann. tit. 10, § 4010–4013 (2024). The Act gives government entities and their employees broad immunity from suit in Section 4011(a), subject to some exceptions outlined in Section 4011(b) and (c).

Daniels first argues that there is a genuine dispute of material fact about whether Detective Saggione "was engaging in a discretionary function" under Section 4011(b). Resp. Br. 17. But that section covers government entities, not employees. *See* § 4011(b). So it does not apply to Detective Saggione.

Moving to Section 4011(c), which does cover employees, Daniels argues that Detective Saggione acted outside the scope of his employment by "failing to disclose exculpatory evidence and fabricating evidence" in a manner that was "wantonly negligent, willful, or done with malicious intent." Resp. Br. 18. That argument melds the two prongs of Section 4011(c), which allows liability "only for those acts which were not within the scope of employment *or* which were performed with wanton negligence or willful and malicious intent." § 4011(c) (emphasis added).

But under either prong, his claim fails. As discussed above, Daniels has not shown that Detective Saggione made up or withheld evidence. Nor can he show that Detective Saggione was consciously indifferent to a risk of harm or acted with willful and

malicious intent. *See McCaffrey v. City of Wilmington*, 133 A.3d 536, 547 (Del. 2016). So the Act bars Daniels's state-law claims.

* * * * *

Daniels lost decades of his life for a crime he may not have committed. But I can decide this case only on the evidence before me. And that evidence shows no genuine dispute of material fact. So I grant summary judgment for Defendants on all claims.